# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | **CRIMINAL ACTION** |
| MARK V. LEMIEUX, ET AL, Defendants, | ) ) ) ) | **NO. 07-10216-RCL** |

### FINDINGS AND ORDER ON MOTION
### TO RESOLVE POTENTIAL CONFLICT OF INTEREST ISSUES AND MOTION TO DISQUALIFY ATTORNEY FOR LEMIEUX FOR POTENTIAL CONFLICT OF INTEREST
### January 10, 2008

**HILLMAN, M.J.**

## I. Introduction

The defendants, Mark V. Lemieux (Lemieux) and Joseph Catanese (Catanese) are before the Court charged with conspiracy to distribute OxyContin (Count One) and conspiracy to collect an extension of credit through extortionate means (Count II)[1]. On November 16, 2007, the United States of America moved for a hearing to determine whether a conflict of interest arises from Attorney Walter Underhill's representation of Lemieux in this case, in light of his prior representation of Catanese. The Government further moved this Court to determine that, if there is a conflict, whether it can be waived by Lemieux and Catanese. After the hearing on this motion, the government filed a Motion To Disqualify Attorney For Lemiuex For Potential

---

[1]. There are two additional defendants named in the above numbered indictment, Tara Drummey (Drummey) and Patrick McCarthy (McCarthy) who have no position on this motion.

Conflict of Interest (Docket No. 74).

## II. **Background**

On May 15, 2007, this Court issued a Criminal Complaint. The defendants were arrested and appeared before the Court on May 16, 2007. At that initial appearance, attorney Walter Underhill (Attorney Underhill) appeared on behalf of Catanese, and attorney Paul Kelly (Attorney Kelly) appeared on behalf of Lemieux. The defendants were advised of their right to a preliminary hearing and the government moved for detention on the grounds that the defendants posed a danger to the community and were a risk of flight. On May 23 and May 29, 2007, this Court conducted a probable cause/detention hearing. The issues of probable cause and detention vehemently contested by both sides. The affiant in support of the application for the Criminal Complaint, Lieutenant Thomas J. Coffey (Lt. Coffey) of the Massachusetts State Police (MSP), was vigorously examined by both Attorneys Underhill and Kelly. At the conclusion of the hearing, this Court proposed conditions of release for the two defendants, which required that they each post a secured bond. On June 1, 2007, Lemieux and Catanese were released. Attorneys Underhill and Kelly were instrumental in assembling and filing a complicated package of documents to enable their respective clients to pledge equity in real estate to secure their release.

Attorney Underhill filed an official appearance on behalf of Catanese with the Court on May 30, 2007. In the notice of appearance, Attorney Underhill indicated that he was filing an appearance "for purposes of probable cause and detention only". *See* Appearance For Purposes Of Probable Cause And Detention Only (Docket No. 15).

On June 26, 2007, the defendants were indicted and their arraignment was noticed for July 18, 2007. On that date, Catanese appeared for the arraignment without Attorney Underhill

and advised the Court the he could no longer afford retained counsel. Lemieux's counsel (Attorney Kelly) agreed to represent Catanese for purposes of the arraignment and Cantanese pled not guilty to all charges against him. Catanese then requested appointed counsel and filed a financial affidavit. On July 27, 2007, this Court found that Catanese was eligible for appointed counsel, but that his financial condition would be further reviewed to determine whether he should contribute to the cost of that counsel. On July 30, 2007, attorney Scott Lopez (Attorney Lopez), as retained counsel, filed a Notice of Appearance on behalf of Catanese (Docket No. 47)[2]. On August 29, 2007, attorney Robert George (Attorney George) filed a Notice of Appearance on behalf of Catanese (Docket No. 55) and Attorney Lopez filed his Motion to Withdraw (Docket No. 56) the next day. The latter motion was allowed on September 6, 2007.

Finally, on November 15, 2007, Attorney Underhill filed a Notice of Appearance on behalf of Lemieux. The government's motion seeking resolution of any potential conflict of interest issues as the result of Attorney Underhill's appearing for Lemieux was filed on November 16, 2007[3]. On November 28, 2007, this Court held a hearing on the government's motion. At that hearing, both defendants were closely questioned by the Court regarding any actual and/or potential conflicts of interest. Counsel were also questioned regarding whether they had discussed with their respective clients any actual and/or potential conflict of interests that would be occasioned by Attorney Underhill's successive representation of Catanese and Lemieux. After the hearing, the government filed a motion to disqualify Attorney Underhill.

---

[2]. Although Attorney Underhill was not terminated as Catanese's counsel by the Court until September 6, 2007, it is undisputed that his representation of Catanese ceased on July 30, 2007.

[3]. All counsel understood at the time that Attorney Underhill filed his notice of appearance that Attorney Kelly would be filing a motion to withdraw as the result of having taken on other professional responsibilities. Attorney Kelly filed his Motion To Withdraw from representing Lemieux (Docket No. 72) on November 26, 2007.

### III. Facts[4]

From November of 2006 to May of 2007, the MSP and the United States Immigration and Customs Enforcement Task Force investigated Lemieux and Drummey for their alleged participation in an OxyContin distribution scheme. During the course of that investigation, a cooperating witness (CW) indicated to Lemieux that he needed assistance in collecting money owed to him by various drug dealers. Lemieux arranged for the CW to meet with Catanese who arranged for the services of the defendant, McCarthy, for the purposes of collecting the CW's drug debts.

Lemieux was a police officer, first with the Metropolitan District Commission (MDC) and later the MSP, from 1987 until his arrest. Catanese was similarly employed by the MDC and the MSP from 1982 until his retirement in 2004. The record indicates that Lemieux and Catanese worked together in the MSP, Bristol County Narcotics Unit around the time of 2002-2004. The probable cause/detention hearing of May 29 revealed that Lemieux and Catanese both have a great deal of experience conducting undercover activities as part of their law enforcement work. *See generally Transcript of Probable Cause and Detention Hearing* (May 29, 2007)(*Tr.*), at pp. 24 to 86.

Lemieux first mentioned Catanese to the CW during a recorded telephone conversation of February 13, 2007. Ex. 1 (*Aff. Of Thomas Coffey dated May 15, 2007*)(*Coffey Aff.*), at p. 22, ¶52[5]. Lemieux told the CW that, he and Catanese were both MSP officers and that they had known each other for 20 years. Lemieux also told the CW he would trust Catanese with his life. Lemieux stated that "He was my partner for years, I've known him for twenty years ... . You can

---

[4] The following facts were elicited during or in relation to the probable cause/detention hearing at which Attorney Underhill represented Catanese.

[5] Lt. Coffey's affidavit can also be found as an attachment to the Complaint (Docket No. 1).

trust him like me ... He might be even more trustworthy, no kidding ... this is the only guy I know that I could do anything with and never, and not worry about it." *Id*.

On April 6, 2007, a meeting occurred between the CW, Catanese, Lemieux, and McCarthy. All are alleged to have engaged in a discussion about the collection of drug debts owed to the CW. The CW exchanged contact information with McCarthy. After this initial meeting was concluded, Catanese, Lemieux and McCarthy continued to confer among themselves for an additional 10 to 15 minutes. On a later date, the CW and McCarthy contacted an undercover law enforcement officer posing as a drug dealer who owed debts to the CW. McCarthy communicated threatening remarks during those meetings regarding the collection of money owed to the CW.  On April 12, 2007, the CW and Lemieux discussed the CW's success in collecting debts. *See Coffey Aff.*, at p. 29, ¶68.

Two weeks prior to the arrest of the defendants in this case, McCarthy's contact with the CW ceased. During the probable cause/detention hearing of May 29, Lt. Coffey testified regarding his post arrest interview of both Catanese and McCarthy. When Lt. Coffey questioned McCarthy about the cessation of his dealings with the CW, "Mr. McCarthy said he had a conversation with Joseph Catanese some time in April and that Catanese told him that Lemieux was being investigated for being dirty and that his girlfriend was selling Oxys [sic] and that they were both hot, and that Catanese advised him to back off the CW." *Tr.*, at p. 4, lines 10-12.

In addition, Lt. Coffey testified that during his post arrest interview of Catanese, he (Catanese) agreed with most of the government's allegations, but made reference to a "bigger picture" and the involvement of the U.S. Coast Guard in Jacksonville, Florida. *Id*. at p. 15, lines 5-10. Upon cross examination of Lt. Coffey, counsel for Catanese (Attorney Underhill) made extensive inquiry into Lt. Coffey's knowledge of a U.S. Coast Guard agent (Mr. Cooper) and the

Coast Guard's relationship to Catanese. Attorney Underhill's questioning revealed that Catanese had contacted Mr. Cooper in the interest of getting Mr. Cooper involved in an alleged investigation. Lt. Coffey testified that Catanese contacted Mr. Cooper concerning a confidential informant who could provide information for such an investigation. *Id.* at p. 72, lines12-19. However, Lt. Coffey also testified that Mr. Cooper found his conversations with Catanese to be very confusing and cryptic. *Id.* Attorney Underhill also questioned Lt. Coffey about the undercover operation as it pertained to Catanese and concerning his knowledge of Catanese's background. Throughout his entire questioning of Lt. Coffey, Attorney Underhill made reference to facts outside of the affidavit and other materials provided by the government.

In concluding his argument against pretrial detention of Catanese, Attorney Underhill stated, "we are suggesting, and I suggest it's nothing more than a suggestion at this juncture, that there is a defense to this case. There's [sic] a defense to this case need not be aired out here at this point in time..." *Id.,* at p. 125, lines 21-24.

### IV.  Discussion

**The Applicable Standard**

The Sixth Amendment to the United States Constitution, provides that a criminal defendant shall have the right to "the assistance of counsel for his defense". The Sixth Amendment affords this right because of the effect that such assistance "has on the ability of the accused to receive a fair trial." *United States v Cronic*, 466 U.S. 648, 658, 104 S.Ct. 2039 (1984). Derivative of the right to counsel under the Sixth Amendment, is the right to have counsel provide effective assistance, *see McMann v Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441 (1970). Thus, "assistance which is ineffective in preserving fairness does not meet the

constitutional mandate." *Mickens v. Taylor*, 535 U.S. 162, 166, 122 Sup.Ct. 1237 (1970) (citing *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S.Ct. 2052 (1984)).  Since the purpose of providing assistance of counsel:

> 'is simply to ensure that criminal defendants receive a fair trial,' in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'  Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

*Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692 (1988)(internal citation and citations to quoted cases omitted).

It follows, therefore, that the "Sixth Amendment right to choose one's own counsel is circumscribed in several important respects", that is, the right to counsel of one's own choosing is not absolute. *Id.*, 108 S.Ct. 1692.  For example, an advocate must be a member of the bar to represent a defendant (other than himself or herself) in court; "a defendant may not insist on representation by an attorney he cannot afford or who declines to represent" him; and a defendant may not "insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party ... ." *Id.*, 108 S.Ct. 1692.  Relevant to this proceeding, the court "can disqualify a defendant's attorney over that defendant's objection where it finds either an actual or a serious potential conflict.". *United States v. Lanoue*, 137 F.3d at 656, 663 (1st Cir. 1998).

The issue of ineffective assistance of counsel for Sixth Amendment purposes manifests itself where the defendant's attorney actively represented conflicted interests. *Holloway v. Arkansas*, 435 U.S. 475, 481-82, 98 S.Ct. 1173 (1978).  Such conflicts traditionally arise when an attorney simultaneously represents clients with differing interests (multiple representation) or,

as is the case here, when an attorney representing a defendant has previously represented a co-defendant or trial witness (successive representation). *United States v Shepard*, 675 F.2d 977, 979 (8th Cir. 1982). Under circumstances where an attorney is faced with conflicting interests between two clients, continuing to represent one client, even if that client is aware of and waives the conflict, may render his assistance ineffective. *Id.* at 664. Thus, where court is faced with a situation where the attorney's representation of one client may create an actual or potential conflict of interest as a result of his prior representation of another client, it must take adequate steps to ascertain whether the conflict warrants the attorney's disqualification. *Lanoue*, 137 F.3d at 664.

In cases of "successive representation, conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir.), *cert. denied*, 488 U.S. 908 (1988). The primary concern is that the attorney's loyalties may be compromised if the former client testifies at the trial of the successive client because: (1) the attorney may be tempted to use confidential information learned during the prior representation to the disadvantage of the former client, or (2) the attorney may fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information learned during the prior representation to the disadvantage of the successive client. *United States v. Agosto*, 675 F.2d 965, 971 & n. 5, 972 (8th Cir. 1982), abrogated on other grounds, *Flanagan v. United States*, 465 U.S. 259, 104 S.Ct. 1051 (1984); *Ross v. Heyne*, 638 F.2d 979, 983 (7th Cir. 1980)(actual conflict would arise where defense counsel is unable to cross-examine prosecution witness effectively because attorney also represented witness). "The second major possibility of conflict in the successive representation situation is that the attorney's pecuniary interest in possible future

business may cause him to make trial decisions with a view toward avoiding prejudice to the client he formerly represented". *Agosto*, 675 F.2d at 971.  The Court finds nothing in the record to suggest that there is any potential conflict in this case as the result of Attorney Underhill's pecuniary interest in possible future business with Lemieux or Catanese.  Therefore, the Court will focus on whether there is an actual or potential conflict of interest in this case because of privileged information which Attorney Underhill learned from Catanese during the course of representing him.

The Eleventh Circuit has held that "in a successive representation case, mere proof that a criminal defendant's counsel previously represented a witness is insufficient to establish" an actual conflict.  *Smith v. White*, 815 F.2d 1401, 1405 (11th Cir. 1987).  Instead, to establish that his attorney had an actual conflict of interest, the defendant must show: (1) that his attorney's "earlier representation of the witness was substantially and particularly related to counsel's later representation of the defendant," or (2) that his attorney "actually learned particular, confidential information during the prior representation of the witness that was relevant to defendant's later case." *Id.; see also Enoch v. Gramley*, 70 F.3d 1490 (7th Cir. 1995)(adopting Eleventh Circuit approach).  The Court finds that Eleventh Circuit test is consistent with the approach adopted by the First Circuit for purposes of evaluating whether actual or potential conflicts of interest warrant that an attorney be disqualified in a criminal case.

When seeking disqualification of counsel, the "government bears a 'heavy burden' of demonstrating" that it is justified since disqualification "should be a measure of last resort." *In re Grand Jury Proceedings*, 859 F.2d 1021, 1026 (1st Cir. 1988) (internal citation and citation to quoted case omitted).  Additionally, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal

proceedings appear fair to all who observed them ... Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized" where an attorney represents successive clients in the same case. *Id.,* 108 S.Ct. 1692 (internal citations omitted)(case involves multiple representation of clients in same case). Therefore, federal courts can and should invoke their inherent power to ensure the fairness of court proceedings to *sua sponte* raise potential conflict issues.

### Applicable Rules of Professional Conduct

In addition to the constitutional concerns raised when the attorney of defendant's choice has a potential conflict, applicable rules of professional conduct may constrain an attorney's ability to represent successive clients. This Court's Local Rules provide that the Massachusetts Supreme Judicial Court Rules, set forth in Rules 3:05, 3:07 and 3:08, shall govern the ethical conduct of attorneys in this Court. LR, D.Mass. 83.6(4). The Massachusetts rules of professional conduct which are applicable in a successive representation situation include:

1. Rule 1.6(a), which states, in pertinent part, that:

    "[a] lawyer shall not reveal confidential information relating to representation of a client unless the client consents after consultation ... .";

2. Rule 1.7, which states, in pertinent part, that:

    "(b) [a] lawyer shall not represent a client if the representation of that client may be may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

    (1)   the lawyer reasonably believes the representation will not be adversely affected; and

    (2)   the client consents after consultation ... ."

3. Rule 1.8(b), which states, in pertinent part, that:

> "[a] lawyer shall not use confidential information relating to representation of a client to the disadvantage of the client or for the lawyer's advantage or the advantage of a third person, unless the client consents after consultation ... ."; and

4.  <u>Rule 1.9(a)</u>, which states, in pertinent part, that:

> "[a] lawyer who has formally represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interest of the former client unless the former client consents after consultation."

*See* Mass. Rules of Professional Conduct, found in Rule 3:07 of the Rules of the Supreme Judicial Court. *See also In re Grand Jury Proceedings*, 859 F.2d at 1023 & n. 3 (citing previous version of Massachusetts Rules of Professional Conduct). In accordance with these rules, there is an absolute bar to Attorney Underhill's representation of Lemieux unless, (1) both Catanese and Lemieux consent to that representation of Lemieux after appropriate consultation; and (2) Attorney Underhill reasonably believes that his representation of Lemieux will not be adversely affected by his responsibilities to his former client, Catanese.

### Discussion of Whether Disqualification is Warranted

As stated above, there is a presumption in favor of a defendant being represented by counsel of his choice. *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692. After an extensive colloquy on the record, both Lemieux and Catanese have orally waived any actual or potential conflict of interest which may be occasioned by Attorney Underhill's representation of Lemieux. In fact, Lemieux insists that Catanese and he have knowingly and intelligently waived any conflict of interest that Attorney Underhill's successive representation of them presents. He points to detailed questioning by this Court that he believes cures any conflict of interest that may be present. Nevertheless, Courts of Appeal have shown a willingness "to entertain ineffective-assistance claims from defendants who have specifically waived the right to conflict-free

counsel". *Id.*, at 161, 108 S.Ct. at 1692.  Thus, where a court find an actual or serious potential conflict of interest, it may disqualify counsel despite the defendants'/clients' waiver.   Therefore, the question now becomes whether under the facts of this case, there is an actual or serious potential conflict of interest which could affect the fairness of these proceedings, or which could appear to undermine the fairness of the proceedings such that this Court should disqualify Attorney Underhill despite the clients' consent.  As discussed more fully below, the Court finds that Attorney Underhill's prior representation of Catanese presents, at a minimum, a serious potential for conflict of interest, if not an actual conflict, which warrants his disqualification.

Whether or not this matter is one of those rare cases where an actual conflict may be demonstrated before trial, it at the least falls alongside "the more common circumstance where a potential for conflict exist which may or may not merge into an actual conflict as the trial progresses." *Wheat,* 486 U.S. at 163, 108 S.Ct. 1692; *see also*, *Lanoue*, 137 F. 3d at 663, 664 (upholding disqualification prior to trial where defense counsel formally represented potential government witness); *United States v. O'Malley*, 786 F.2d 786, 792 (7th Cir. 1987)(upholding pretrial disqualification on grounds that defendant's counsel had previously represented major government witness).   It is the inability of this court to foresee the exact nature of any conflict and the fact that the conflicting interests are prospective that moves this Court to consider the disqualification of Attorney Underhill: "[u]nfortunately for all concerned, a district court must pass on the issue of whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between the partes are seen through a glass darkly." *In Re: Grand Jury Proceedings*, 859 F.2d at 1024.

The conflicts presented by attorney Underhill's former representation of Catanese, and

the potential for future conflicts are, in my opinion far to great to waive.  Attorney Underhill points out that he represented Catanese only for the limited purpose of his initial appearance and the issues of probable cause and detention.  The Court is unpersuaded by Attorney Underhill's attempt to downplay his prior representation of Catanese.  The initial appearance took place on May 16, 2007; the probable cause/detention hearing was scheduled a week later to give all parties an adequate time to prepare.  The issues of probable cause and detention were hotly contested by the parties and the hearing itself took place over a two day period.  Attorney Underhill rigorously cross-examined Lt. Coffey during which he sought to undercut the bases for Lt. Coffey's factual suppositions.  Furthermore, at the conclusion of the hearing, Attorney Underhill, in arguing in support of Catanese's release, stated that: "we are suggesting, and I suggest that it's nothing more than a suggestion at this juncture, that there is a defense to this case.  There's a defense to this case [sic.] need not be aired out here at this point in time... ." *Tr.*, at p. 123.  The obvious inference from this statement and from the questions posed to Lt. Coffey by Attorney Underhill is that Attorney Underhill and Catanese necessarily had substantive communications concerning the facts and law underlying the instant charges against Catanese, communications which necessarily would be subject to the attorney/client privilege and would clearly be relevant to this case.

Still, the Court would be inclined to allow Attorney Underhill to continue to represent Lemieux if it were unlikely that either client would be disadvantaged by the successive representation.  However, Attorney George, Catanese's present counsel, has informed the Court that Catanese intends to testify at the trial of this case in his own defense.  If he testifies, Attorney Underhill will be faced with the dilemma of cross-examining his former client and having to make important, and presumably rapid, decisions about whether any cross-examination

is the result of information that he had earlier received from Catanese or was derived independently. Attorney Underhill actively represented Catanese for over two and a half months. He is an experienced trial attorney who understands the value of properly preparing and investigating his cases. I have no doubt that in furtherance of his representation of Catanese Attorney Underhill obtained as much information from his client as he could about the circumstances of the events leading up to his arrest and other salient details about his twenty year relationship with Lemieux. This is not mere supposition on the Court's part, rather the finding that substantive communications pertaining to this case were exchanged between Attorney Underhill and Catanese is supported by Attorney Underhill's extensive cross-examination of Lt. Coffey and the statement that "we" believe there is a defense. Additionally, the facts elicited during the course of the probable cause/detention hearing make it clear that with respect to the crimes charged, the interests of Catanese and Lemieux will be adverse to one another. Under these circumstances, the Court finds that there is an unacceptable risk that Attorney Underhill will be faced with either using confidential information obtained from Catanese during his cross-examination of him[6], or that he may fail to rigorously cross-examine Catanese in order to ensure that he does not inadvertently disclose such confidential information, which would be to the detriment of his current client, Lemieux. *Accord United States v. Delevo*, 2002 WL 844401, CR.A. 00-20036-MAP, CR.A. 01-30024-FHF, at *6 (D.Mass. Apr. 4 2002)(when attorney is put in position of having to cross-examine a former client, there is obviously a serious potential for conflict, especially when the subject matter of the

---

[6.] The Court is not suggesting that Attorney Underhill would intentionally disclose confidential information obtained from Catanese. Rather, given that the successive representation is occurring in the same case, it will be much more difficult for Attorney Underhill to differentiate what he learned from Catanese versus what he learned from Lemieux or otherwise independently and therefore, there is a high risk for inadvertent disclosure of confidential information.

representations overlap).

Lemieux has chosen Attorney Underhill to represent him in this matter. However, as stated above, Lemieux's right to counsel of his choice is not absolute. Under the circumstances, in order to preserve the fairness and integrity of the proceedings, I am compelled to disqualify Attorney Underhill from representing defendant Lemieux.

## V. Order

1. The government's Motion to Resolve Potential Conflict of Interest Issues (Docket No. 67) is **granted** and a hearing has been held in connection therewith;

2. The government's Motion To Disqualify Attorney For Lemieux For Potential Conflict Of Interest (Docket No. 74) is **granted**.

The Court finds that a conflict of interest exists and that Attorney Walter Underhill is disqualified from his representation of the defendant Mark V. Lemieux. Accordingly, Attorney Underhill shall forthwith file his Notice of Disappearance.

/s/ Timothy S. Hillman
TIMOTHY S. HILLMAN
MAGISTRATE JUDGE